## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIA CAPELLA, | ) | 3:20-CV-01581 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF WINDSOR LOCKS, | ) | |
| *Defendant*. | ) | January 13, 2023 |

## RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

In this disability discrimination action, Plaintiff Maria Capella alleges that her former employer, Defendant Town of Windsor Locks, Connecticut ("Defendant" or "Windsor Locks"), discriminated against her after she suffered a traumatic brain injury in a motor vehicle accident. Plaintiff's complaint alleges that Defendant failed to reasonably accommodate her in violation of both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.*, and that Defendant wrongfully terminated her in violation of the ADA.

Defendant seeks summary judgment on both of Plaintiff's claims, asserting that Plaintiff was never denied an accommodation she requested, has not presented any evidence suggesting that Defendant discriminated against her, and was discharged from her employment with Defendant for the legitimate, nondiscriminatory reason that she abandoned her job and was chronically absent. In response, Plaintiff asserts that Defendant did, in fact, deny her an accommodation and argues that there are genuine issues of material fact as to whether she was terminated because of her disability.

For the reasons described below, the Court agrees with Plaintiff that genuine issues of material fact remain as to whether Defendant wrongfully terminated her in violation of the ADA.

The Court agrees with Defendant, however, that the record does not contain any evidence demonstrating that Defendant failed to reasonably accommodate Plaintiff with respect to her disability.  Defendant's motion is thus GRANTED IN PART and DENIED IN PART.

## I.      FACTUAL BACKGROUND

Unless otherwise noted herein, the parties agree on the following facts.  Plaintiff worked for Defendant as Assistant Town Clerk from October of 2014, until around July or August of 2019. Pl.'s L. R. 56(a)2 St., ECF No. 40-2, ¶¶ 1–2, 9; *see* Ex. G to Def.'s Mot., ECF No. 36-9 (September 30, 2019, letter stating that Plaintiff was "deemed to have resigned as of July 19, 2019").  At all relevant times, the Office of the Town Clerk in Windsor Locks was a two-person office, comprised of only Plaintiff and Town Clerk William Hamel.  Pl.'s L. R. 56(a)2 St. ¶ 5.  Hamel, who had initially encouraged Plaintiff to apply for the Assistant Town Clerk position, was Plaintiff's supervisor.  *Id.* ¶¶ 3–4.

Around September 15, 2018, Plaintiff was involved in a motor vehicle accident, in which she sustained injuries.  *Id.* ¶ 6.  Following the accident, Plaintiff's doctors diagnosed her with post-concussion syndrome and gait imbalance, *id.* ¶ 7, and Defendant concedes that the accident left Plaintiff disabled, *see id.* ¶ 10.  Plaintiff was out of work recovering from her injuries from September 15, 2018, until November of 2018.  *Id.* ¶ 8.  During this recovery period, and in the months that followed, Plaintiff submitted five doctor's notes to Defendant, in which she requested only two specific accommodations with respect to her disability.  *Id.* ¶¶ 9–10, 13.  First, Plaintiff requested that she not be required to work more than three and a half hours per day.  *Id.* ¶ 11. Second, Plaintiff requested that she be permitted to be absent from work for brief intervals for medical treatment.  *Id.* ¶ 12.  Plaintiff admits that, after she made these requests, Defendant did

not require her to work more than three and a half hours per day, and permitted her to take brief absences from work for medical treatment when she needed them. *Id.* ¶¶ 14–15.

Following Plaintiff's accident, Hamel made several remarks relating to Plaintiff's disability. First, Hamel drew comparisons between his disabled son and Plaintiff on at least three occasions when Plaintiff forgot something or made a mistake. *Id.* ¶ 17. On at least one occasion, Hamel told Plaintiff: "Jesus Christ, you can't remember anything. You're just like [my son]." *Id.* Hamel also told Plaintiff that if she continued to maintain her half-day schedule, she was "going to walk," and that his life would be better if she were no longer employed by Defendant. *Id.* ¶ 18. In addition, after Plaintiff had been out of work for a week due to a case of vertigo, Hamel said to her, "I hope that's the last vacation you take." *Id.* ¶ 19; Capella Depo. Tr., ECF No. 36-3, at 33:12–33:23. Defendant contends that Plaintiff "was not discriminated against by any employee or agent of Defendant other than Mr. Hamel." Pl.'s L. R. 56(a)2 St. ¶ 20. In response, Plaintiff concedes that, "[t]o her knowledge, only [Hamel] discriminated against her." *Id.*

At some point before July 18, 2019, Plaintiff asked Hamel if she could take a vacation to attend a Porsche car convention in Florida. *Id.* ¶ 21. At the time Plaintiff made this request, she had no remaining paid time off. *Id.* ¶ 22. Hamel initially told Plaintiff that if she reduced the length of the vacation, then they could "work it out" as unpaid leave. *Id.* ¶ 24. Previously, in or around December of 2018, Hamel had offered to allow Plaintiff to use some of his own unused paid time off, but Windsor Locks First Selectman J. Christopher Kervick denied this request. *Id.* ¶ 23. At the time, Kervick expressed concern about the precedent he would be setting by approving the request, as well as the implications such approval would have with respect to workplace morale. *Id.* The parties dispute whether Defendant's employment policy allows anyone other than the First Selectman of Windsor Locks to grant town employees unpaid leave. *Id.* ¶ 25.

On July 18, 2019, Hamel informed Plaintiff that she could not take the vacation she requested because Kervick had overruled Hamel's decision to allow Plaintiff to take the vacation as unpaid leave.  *Id.* ¶ 26.  Hamel also told Plaintiff that, if she did go on the vacation, then she would be resigning from her employment with Defendant.  *Id.*  Hamel then reiterated to Plaintiff several times that if she went on the vacation, she would be resigning.  *Id.*  During this conversation, although Plaintiff wanted to tell Hamel that she was not resigning, she was unable to do so because Hamel continued to speak over her.  *Id.* ¶ 27.  Plaintiff subsequently left Defendant's workplace to take her vacation, *id.* ¶ 28, and she never returned to work after that day, *id.* ¶ 29.

Shortly after Plaintiff's July 18, 2019, departure, Kervick held a meeting to discuss Plaintiff's employment.  *Id.* ¶ 30.  Defendant represents that its Director of Human Resources Shannon Walker, as well as its Town Attorney, were present for the meeting, but Hamel was not. *Id.*  Although Plaintiff contends that the record does not make clear who was at this meeting, she offers no evidence to dispute Hamel's representation that he did not attend.  *Id.*

Around July 30, 2019, Walker sent a certified letter to Plaintiff inquiring about her employment status.  *Id.* ¶ 31.  Walker's letter, which Plaintiff received when she returned from vacation, requested that Plaintiff clarify her intentions "with regards to . . . returning to employment" and stated:  "If we do not hear a response from you the Town will consider your departure a voluntary resignation within 7 days."  *Id.* ¶¶ 31–32.  On August 8, 2019, Plaintiff sent Walker an email, stating in full:  "I have not resigned but have been pressured on an ongoing basis by Bill Hamel to give a resignation letter and do not want to be subjected to that type of harassment anymore."  *Id.* ¶ 33.

Around August 12, 2019, Plaintiff filed a grievance with her union, alleging that Hamel was harassing her.  *Id.* ¶ 38.  Plaintiff's grievance was subsequently ruled "unfounded" or "not actually accepted as being filed."  *Id.* ¶ 39.  As a result, Plaintiff was told to return to work, but she did not do so.  *Id.* ¶¶ 39–40.  Plaintiff later testified that she felt she could not return to work unless Hamel was removed from the Town Clerk's office.  *Id.* ¶ 36.

On September 30, 2019, Defendant sent Plaintiff a letter, which stated:  "Due to our continuing need to serve the Town effectively and efficiently, your failure to return to work since your July 19, 2019, departure without notice, and your statement that you would mail a letter of resignation, you are hereby deemed to have resigned from employment by the Town of Windsor Locks as of July 19, 2019."  Ex. G to Def.'s Mot.; *see* Pl.'s L. R. 56(a)2 St. ¶ 43.  This letter was written on Hamel's letterhead and signed by Hamel.  Ex. G to Def.'s Mot.

Defendant represents, and Plaintiff does not dispute, that Kervick "made the ultimate decision to separate Plaintiff" from her employment with Defendant.  Pl.'s L. R. 56(a)2 St. ¶ 41.  Defendant further represents that Kervick made this decision in consultation with Walker and the Town Attorney, but not Hamel; Plaintiff, however, disputes this assertion, noting that Hamel admitted to having discussions with Walker and Kervick about Plaintiff after she departed for vacation.  *Id.* ¶ 42.

## II.   PROCEDURAL BACKGROUND

Plaintiff initiated this action in October of 2020, by filing a two-count complaint against Defendant in Connecticut Superior Court.  Compl., ECF No. 1-1.  In Count One of the complaint, Plaintiff alleges that Defendant wrongfully terminated her without reasonable accommodation in violation of the ADA.  *See id.* ¶¶ 13, 15.  In Count Two, Plaintiff alleges that Defendant violated the CFEPA by refusing to reasonably accommodate her so that she could continue to work despite

her disability.  *See id.* ¶ 17.  Defendant removed this action to federal court, and the case was thereafter transferred to the undersigned.  In March of 2022, following the close of discovery, Defendant filed the present motion for summary judgment, ECF No. 36.

### III.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  With respect to materiality, a fact is "material" only if a dispute over it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  A movant, however, "need not prove a negative

6

when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

### IV.    WRONGFUL TERMINATION UNDER THE ADA

In Count One, Plaintiff alleges that, after failing to reasonably accommodate her, Defendant wrongfully terminated her in violation of the ADA.  The Court will first address Plaintiff's wrongful termination claim.  A plaintiff may base a disability discrimination claim on "one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation."  *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).  Plaintiff appears to assert her wrongful termination claim under a disparate treatment theory.

Defendant contends that summary judgment is warranted on Plaintiff's wrongful termination claim because she has presented no evidence that she was terminated because of her disability.  Defendant further asserts that it had a legitimate, nondiscriminatory reason for terminating Plaintiff, and that Plaintiff cannot show that this reason was a pretext for discrimination.  After reviewing the record, the Court finds that genuine issues of material fact preclude summary judgment on this claim.

A.  <u>Legal Standard</u>

The ADA prohibits discrimination "against a qualified individual on the basis of disability" with respect to, among other things, discharge from employment.  42 U.S.C.A. § 12112(a).  Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting framework the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, "a plaintiff first bears the 'minimal' burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a 'legitimate, nondiscriminatory reason' for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination."  *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006).

In order to establish a *prima facie* case of disparate treatment disability discrimination under the ADA, a plaintiff must show that:  "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability."  *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)).

To satisfy the final prong of her *prima facie* case, a plaintiff must show that the adverse employment action she experienced "took place under circumstances giving rise to an inference of discrimination."  *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  Circumstances giving rise to an inference of discrimination may include, for example, "[a]ctions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus"

and "preferential treatment given to employees outside the protected class." *Simon v. City of New York*, No. 17 CIV. 9575 (DAB), 2019 WL 916767, at *5 (S.D.N.Y. Feb. 14, 2019) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).

If the plaintiff establishes her *prima facie* case of discrimination, the burden shifts to her employer to "articulate some legitimate, nondiscriminatory reason" for its conduct. *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019). Once the employer has articulated such a reason, the burden shifts back to the plaintiff "to demonstrate that the proffered reason is in fact a pretext for discrimination." *Payne v. Cornell Univ.*, No. 21-109-CV, 2022 WL 453441, at *2 (2d Cir. Feb. 15, 2022) (summary order). A plaintiff may attempt to show pretext, for example, "by reliance on the evidence comprising the *prima facie* case" or "by demonstrating that similarly situated employees outside the protected class were treated differently." *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 260–61 (S.D.N.Y. 2009) (citations and internal quotation marks omitted) (italicization added). A plaintiff may also demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.*

The ADA "requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Rambacher v. Bemus Point Cent. Sch. Dist.*, 307 F. App'x 541, 543 (2d Cir. 2009) (summary order).

B.  Discussion

Defendant asserts that Plaintiff cannot establish a *prima facie* case of discrimination and that, even if she could, Defendant has provided a legitimate, nondiscriminatory reason for discharging Plaintiff, which Plaintiff cannot prove is a pretext for discrimination.   The Court disagrees on both points.

1.  *Plaintiff's* Prima Facie *Case*

Defendant concedes that Plaintiff can establish all but the final prong of her *prima facie* case.  In other words, Defendant does not dispute that it is subject to the ADA, that Plaintiff was disabled within the meaning of the ADA, that Plaintiff was qualified to perform her job, and that Plaintiff suffered an adverse employment action—namely, her discharge from employment with Defendant.[1]  The only disputed element of Plaintiff's *prima facie* case is whether she suffered an adverse employment action *because of* her disability.

On this point, Defendant admits that Hamel made disparaging remarks to Plaintiff about her disability.[2]  Defendant contends, however, that these remarks do not create an inference of discrimination because Hamel played no meaningful role in the decision to discharge Plaintiff. The Court finds that genuine disputes of material fact remain as to Hamel's role in the decision to discharge Plaintiff.   The Court further finds that, if Hamel did play a meaningful role in that

---

[1] In Count One, Plaintiff confusingly pleads that Defendant "constructively wrongfully terminated" her.  Compl. ¶ 15. Plaintiff's counsel offered little clarity about this theory at oral argument, claiming that Plaintiff was both wrongfully terminated by Defendant *and* constructively discharged by way of involuntary resignation.  At the outset, it is clear that Plaintiff's employment with Defendant came to an end *either* because she resigned *or* because she was affirmatively terminated.  Defendant has conceded in its briefing and in oral argument that it affirmatively terminated Plaintiff, and Plaintiff's communications with Defendant stated that she "ha[d] not resigned," despite being pressured by Hamel to do so.  Pl.'s L. R. 56(a)2 St. ¶ 33.   Therefore, Plaintiff has not shown that Defendant, rather than discharging her directly, "intentionally create[d] a work atmosphere so intolerable" that she was "forced to quit involuntarily."  *See Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003); *see also Green v. Brennan*, 578 U.S. 547, 555 (2016) (recognizing that a plaintiff advancing a constructive discharge claim must "show that [s]he actually resigned").  Her constructive discharge argument, to the extent she is making one, thus fails.

[2] While Defendant's briefing states that Hamel is "*alleged* to have engaged in several acts evincing an animus toward Plaintiff because of her disability," ECF No. 36-1 at 3 (emphasis added), Defendant does not contest the statements made by Hamel and, indeed, identifies them as undisputed in its Local Rule 56(a)1 statement.

decision, then his disparaging comments suffice to raise an inference of discrimination with respect to Plaintiff's discharge.  Thus, because a reasonable jury could find that Hamel played a meaningful role in Plaintiff's discharge and was motivated by discriminatory animus in doing so, the Court rejects Defendant's argument that Plaintiff cannot establish her *prima facie* case.

As a preliminary matter, Plaintiff's efforts to establish her *prima facie* case hinge on Hamel's purported involvement in her termination.  Plaintiff concedes that "to her knowledge," only Hamel discriminated against her, Pl.'s L. R. 56(a)2 St. ¶ 20, and she does not point to any evidence of discrimination on the part of any individuals other than Hamel.  She further admits that Kervick, rather than Hamel, made the "ultimate decision" to terminate her.  *Id.* ¶ 41.  Plaintiff asserts, however, that Hamel, as her direct supervisor in a two-person office, took part in this decision.  *Id.* ¶ 42.  Accordingly, while Plaintiff's briefing is short and lacks clarity, her attempt to establish that Defendant terminated her due to her disability appears to be based predominantly on Hamel's purported involvement in her termination.

In assessing whether triable issues of fact remain with respect to Plaintiff's *prima facie* case, the Court begins by rejecting Defendant's suggestion that, because Kervick ultimately decided to terminate Plaintiff, the Court should only consider Hamel's alleged discriminatory animus if it can be imputed to Defendant under the "cat's paw" theory of liability.   The "cat's paw" theory "imputes a discriminatory motive to a decisionmaker of an adverse employment action where such action is proximately caused by the animus of his subordinate—that is, 'the supervisor, acting as agent of the employer, has permitted himself to be used as the conduit of the subordinate's prejudice.'"  *Gentleman v. State Univ. of N.Y. Stony Brook*, No. 21-1102-CV, 2022 WL 1447381, at *4 (2d Cir. May 9, 2022) (summary order) (quoting, in part, *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)).   The Second Circuit has "never

determined whether the 'cat's paw' theory of liability can apply under the 'but-for' standard of causation applicable to claims under the ADA." *See id.*; *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 129 (D. Conn. 2020) (same).

Even if use of the cat's paw theory is permissible in an ADA case, though, the Court disagrees with Defendant that Plaintiff must rely on the theory in this case. The theory assumes, from the outset, that the employee with demonstrated discriminatory animus played no direct role in the employment decision himself, but, rather, manipulated a superior into effectuating the employee's "unlawful design." *Vasquez*, 835 F.3d at 272. Here, as set forth below, Plaintiff has presented sufficient evidence suggesting that Hamel himself played a meaningful role in her termination and, therefore, she need not present evidence demonstrating that Hamel's discriminatory motive could be imputed to *another* decisionmaker. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (holding, in the Title VII context, that a plaintiff is entitled to succeed "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process" (cleaned up) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999))).

The record in this case includes several pieces of evidence that, when viewed in the light most favorable to Plaintiff, could lead a reasonable jury to conclude that Hamel, Plaintiff's direct supervisor, played a meaningful role in deciding to terminate Plaintiff. First, Hamel told Plaintiff a few months before her employment ended that, if she continued to maintain the half-day schedule necessitated by her disability in the future, she was "going to walk," meaning she would be terminated. Pl.'s L. R. 56(a)2 St. ¶ 18; Capella Aff., ECF No. 40-3, ¶¶ 8–9. Second, on Plaintiff's last day of work for Defendant, Hamel repeatedly told Plaintiff that she would be resigning if she took her vacation, said "you're resigning" to Plaintiff several times, and asked Plaintiff for a

resignation letter.  *See* Pl.'s L. R. 56(a)2 St. ¶¶ 26–27; Capella Depo. Tr. at 70:19–71:22; Hamel

Depo. Tr., ECF No. 40-11, at 27:21–28:6.  Kervick and Walker then suggested that Hamel write a

memorandum documenting the events of Plaintiff's last day.  Hamel Depo. Tr. at 28:14–28:25.

Then, at some point after Plaintiff left for her vacation, Hamel told Walker that he did not

know where things stood with Plaintiff's employment.  *Id.* at 38:6–38:13.  This discussion with

Walker precipitated a conversation between Plaintiff, Kervick, and Plaintiff's union about

Plaintiff's employment.  *Id.* at 38:6–38:18.  Later, in another conversation, Walker reported to

Hamel that "she went over everything" regarding Plaintiff's employment status and that he had

"done everything right," including by "document[ing] the file beforehand."  Hamel Depo. Tr., ECF

No. 36-4, at 39:9–39:20.  Hamel also spoke to Kervick about Plaintiff after her final day of work,

though he could not recall the content of that conversation.  *Id.* at 39:21–39:24.  Kervick recalls

that Hamel provided him with "background information" about Plaintiff's attendance issues "from

the fall of 2018 until the summer of 2019," but stated that Hamel did not influence his decision to

terminate Plaintiff.  Kervick Aff., ECF No. 36-18, ¶ 7.  Ultimately, however, the September 30,

2019, letter declaring that Plaintiff was no longer an employee of Defendant was drafted on

Hamel's letterhead and bears Hamel's signature.  Ex. G to Def.'s Mot.

Construing this evidence in the light most favorable to Plaintiff, a reasonable jury could

find that Hamel played a meaningful role in the decision to terminate Plaintiff, even if Kervick

may have had the final say.  For instance, a reasonable jury could interpret Hamel's comments to

Plaintiff leading up to and on her last day of work, and his documentation of the events of her last

day on the advice of Kervick and Walker, as supporting Plaintiff's theory that Hamel had

significant input on any decision to end Plaintiff's employment.  In addition, factual questions

remain about the impact of the conversations Hamel had with Kervick and Walker after Plaintiff's

last day.  Standing alone, of course, conversations in which Hamel simply relayed information to others regarding Plaintiff's employment likely would not suffice to raise genuine issues of material fact as to whether Hamel played a meaningful role in Plaintiff's termination.  When viewed in the light most favorable to Plaintiff, however, the conversations—which began with Kervick and Walker advising Hamel to document the events of Plaintiff's last day, continued with Walker telling Hamel that he had done everything "right," and concluded with Hamel providing Kervick information about Plaintiff's "attendance issues" beginning after her car accident—set in motion Defendant's process for terminating Plaintiff.  This process culminated in Hamel, not Kervick, signing the termination letter that ended Plaintiff's employment.

This evidence raises questions of fact about Hamel's role in the decision to terminate Plaintiff that a jury must resolve.  Indeed, the extent to which Hamel was involved in the decision, if at all, will turn in part on the credibility of Hamel, Kervick, and, to a lesser extent, Walker.  Such credibility determinations are matters reserved for the jury.  *Kee*, 12 F.4th at 166 ("With respect to the evidence, at the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . for these are 'jury functions, not those of a judge.'" (quoting *Anderson*, 477 U.S. at 255)).  Certainly, a reasonable jury could find that Hamel was merely the messenger who informed Plaintiff of Kervick's decision to terminate her.  But, drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, there is sufficient evidence in the record to suggest that Hamel did in fact play a meaningful role in Plaintiff's termination.

Having found that there are genuine issues of material fact as to Hamel's role in Plaintiff's termination, Defendant's argument regarding Plaintiff's *prima facie* case collapses upon itself. Defendant admits that there are several pieces of evidence showing that Hamel "engaged in several

acts *evincing an animus* towards Plaintiff because of her disability." ECF No. 36-1 at 3 (emphasis added). First, Hamel made fun of Plaintiff by drawing comparisons between Plaintiff and Hamel's disabled son, who has cerebral palsy, including by saying: "Jesus Christ, you can't remember anything. You're just like [my son]." Pl.'s L. R. 56(a)2 St. ¶ 17. Second, after Plaintiff was out of work for a medical issue, Hamel said to her, "I hope that's the last vacation you take." *Id.* ¶ 19. Third, Hamel told Plaintiff that if she continued to maintain her half-day schedule, she was "going to walk" and that his life would be better if she were no longer employed by Defendant. *Id*. ¶ 18. Rather than contest whether this evidence could raise an inference of discrimination, Defendant concedes: "Plaintiff was not discriminated against because of her disability by any employee or agent of Defendant *except Mr. Hamel*." ECF No. 36-1 at 3 (emphasis added) (citing Capella Depo. Tr. at 30:6–30:8). Thus, this evidence is sufficient to raise an inference that, to the extent Hamel took part in the decision to terminate Plaintiff, he was acting with discriminatory animus.

Due to the genuine issues of material fact as to whether Hamel—whose conduct was sufficient to raise an inference that he was motivated by discriminatory animus against Plaintiff— played a meaningful role in the decision to terminate Plaintiff, the Court cannot grant summary judgment in favor of Defendant at the *prima facie* stage of the *McDonnell Douglas* analysis. Such genuine issues of material fact do not, however, altogether preclude the Court from granting summary judgment in favor of Defendant. Rather, if the Court assumes Plaintiff has established her *prima facie* case, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for discharging Plaintiff. If Defendant articulates a legitimate, nondiscriminatory reason, the burden will then shift back to Plaintiff to show that Defendant's reason is a pretext for discrimination. Summary judgment thus may still be appropriate if Plaintiff cannot meet her resulting burden.

### 2.  *Defendant's Legitimate, Nondiscriminatory Reason*

Defendant contends that it discharged Plaintiff because she abandoned her job and was chronically absent.  In support, Defendant offers testimony that Plaintiff took an unauthorized vacation, despite being told that she would be resigning if she did so, and never returned to work after the vacation.  *See* Capella Depo. Tr. at 60:3–60:7, 69:22–70:15, 79:5–79:9; Hamel Depo. Tr. at 27:4–27:20; *see also* Kervick Aff. ¶ 9 (averring that the decision to discharge Plaintiff "was based on her chronic failure to come to work, and that issue alone").  Defendant also offers evidence that, pursuant to its employee handbook, Plaintiff's conduct presented grounds for termination.  Ex. C to Def.'s Mot., ECF No. 36-5, at 9.  In addition, Hamel's September 30, 2019, letter to Plaintiff stated that she was deemed to have resigned due, in part, to her "failure to return to work since [her] July 19, 2019, departure without notice."  Ex. G to Def.'s Mot.

This evidence suffices to show a legitimate, nondiscriminatory reason for discharging Plaintiff.  *See Bryan v. Mem'l Sloan Kettering Cancer Ctr.*, No. 18 Civ. 1300 (AT) (SLC), 2022 WL 4096862, at *15 (S.D.N.Y. May 18, 2022), *report and recommendation adopted*, No. 18 Civ. 1300 (AT) (SLC), 2022 WL 4096897 (S.D.N.Y. Sept. 7, 2022) (finding that plaintiff's "excessive unscheduled absences constituted a legitimate, non-discriminatory reason for [his employer] to terminate his employment" (collecting cases)).  Therefore, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for discrimination.

### 3.  *Pretext*

Turning to the final step of the *McDonnell Douglas* analysis, the Court finds that the record contains sufficient evidence to raise genuine issues of material fact as to whether Defendant's proffered reason is a pretext for discrimination.  The Court begins by examining the evidence discussed above regarding Hamel's disparaging remarks to Plaintiff.  *See Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (after the defendant meets its burden of production, the court may "still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual" (italicization added) (cleaned up)); *Piela v. Conn. Dep't of Corr.*, No. 3:10-CV-749 (MRK), 2012 WL 1493827, at *8 (D. Conn. Apr. 26, 2012) (noting that "pretext may be demonstrated . . . by reliance on the evidence comprising the *prima facie* case").  For the reasons discussed below, this evidence—when viewed alongside other circumstances surrounding Plaintiff's discharge—is sufficient to raise triable issues of fact as to whether Defendant's proffered reason for discharging Plaintiff is a pretext for discrimination.

Although offensive remarks in the workplace, standing alone, are generally insufficient to prove discrimination, "if there is a nexus between the remarks and the plaintiff's termination, there may be sufficient evidence of pretext to survive a motion for summary judgment."  *Koppenal v. Nepera, Inc.*, 74 F. Supp. 2d 409, 413 (S.D.N.Y. 1999); *see Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (stating that stray remarks, "*without more*, cannot get a suit to a jury").  Here, Hamel's comments were not only offensive, but relate directly to Plaintiff's job performance and discharge.  Defendant admits that Hamel made several disparaging comments about Plaintiff's disability.  As discussed above, Defendant concedes that, after Plaintiff had been out of work due to a medical issue, Hamel told Plaintiff that he hoped her medical leave would be the "last vacation" she took.  ECF No. 36-1 at 3.  Defendant further concedes that, on at least three occasions, Hamel compared Plaintiff to his disabled son due to her purported mistakes and forgetfulness.  *Id.*  These comments are especially pertinent to the Court's analysis in that they relate directly to Plaintiff's job performance.  *Cf. Rivera v. Apple Indus. Corp.*, 148 F. Supp. 2d 202, 216 (E.D.N.Y. 2001) (finding that plaintiff failed to establish pretext where alleged

disparaging comments about his disability were made "in contexts *unrelated* to his job performance" (emphasis added)).  Most notably, Defendant concedes that Hamel stated that if Plaintiff continued to maintain her half-day schedule, she was "going to walk" and that his life would be better if she were no longer employed by Defendant.  ECF No. 36-1 at 3 (citing Capella Depo. Tr. at 34:5–34:10).  Because this comment relates directly to Plaintiff's discharge and suggests that Hamel wanted Plaintiff's employment with Defendant to end *because of* issues concerning her disability, it constitutes particularly compelling evidence of pretext.  *See Barber v. Saint Gobain Performance Plastics Corp.*, No. 1:04-CV-106, 2006 WL 2662853, at *7 (D. Vt. Sept. 14, 2006) (in context of ADA retaliation claim, denying summary judgment where plaintiff had "presented disparaging statements by managers" insinuating that employees with physical limitations "were 'deadwood' that needed to be replaced").

Rather than argue that Hamel's remarks were simply stray remarks that do not provide evidence of discrimination,[3] Defendant's briefing concedes that Hamel *did* discriminate against Plaintiff.  ECF No. 36-1 at 3 ("Plaintiff was not discriminated against because of her disability by any employee or agent of Defendant *except Mr. Hamel*." (emphasis added) (citing Capella Depo. Tr. at 30:6–30:8)).  Defendant's argument regarding pretext thus necessarily depends in large part on its assertion that Hamel was uninvolved in the decision to discharge Plaintiff, as to which there

---

[3] In determining whether certain remarks are probative of discriminatory intent and are therefore admissible at trial, the Second Circuit has directed courts to consider:  "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see Gaydos v. Sikorsky Aircraft, Inc.*, No. 14-CV-636 (VAB), 2016 WL 4545520, at *12 (D. Conn. Aug. 31, 2016) (at summary judgment stage, district court applied the four-part test set forth in *Henry* with respect to the pretext step of its *McDonnell Douglas* analysis).  Here, Hamel was Plaintiff's direct supervisor and may have played a central role in deciding to discharge Plaintiff.  In addition, Hamel's comments were arguably related to the decision to discharge Plaintiff, and a reasonable jury could find that the comments were discriminatory.  Finally, given that Plaintiff was back at work for only a matter of months between her accident and her termination, Hamel appears to have made some, if not all, of these comments relatively close to the time of Plaintiff's discharge.  These factors suggest that the comments would be probative of whether Defendant discriminated against Plaintiff in this case.

18

are genuine issues of material fact.  Given the undisputed evidence of Hamel's discriminatory animus, as well as the evidence regarding Hamel's role in discharging Plaintiff, a reasonable jury could conclude that Plaintiff's discharge was not simply based on her vacation and absences; rather, a jury could determine that the discharge would not have occurred but for Hamel's discriminatory animus.  The jury could thus conclude that Defendant's proffered reason is a pretext for discrimination.  *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) ("[U]nless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial." (italicization added)).[4]

In sum, the record before the Court contains evidence demonstrating that Hamel exhibited discriminatory animus toward Plaintiff.  Defendant itself suggests, at least for purposes of summary judgment, that Hamel *did* discriminate against Plaintiff and admits that Hamel made comments suggesting that he wanted Plaintiff to no longer be employed by Defendant because of her disability.  These concessions, when viewed alongside the genuine issues of material fact as to Hamel's role in discharging Plaintiff, preclude summary judgment on Plaintiff's disparate treatment claim.  Of course, a reasonable jury could conclude that Plaintiff was discharged because she failed to return to work after her vacation.  But because the same jury could also conclude that Plaintiff's supervisor was motivated by his demonstrated discriminatory animus while

---

[4] The Court further notes that, although Defendant claims that it made the decision to discharge Plaintiff due to her chronic absences in the days *after* she left for her vacation, the record contains evidence that Hamel told Plaintiff she was resigning *on the day* she left for vacation.  This raises further questions about whether Defendant truly discharged Plaintiff due to her chronic absences after her vacation or, instead, made the decision to discharge Plaintiff on the day she left for her vacation.

meaningfully involved in the decision to discharge Plaintiff, and thus that Plaintiff experienced unlawful disability discrimination, summary judgment must be denied.

## V.      FAILURE TO ACCOMMODATE UNDER THE ADA AND CFEPA

Counts One and Two of the complaint both allege that Defendant failed to reasonably accommodate Plaintiff with respect to her disability.  Count One alleges that Defendant's failure to accommodate Plaintiff violated the ADA, while Count Two alleges that the failure to accommodate violated the CFEPA.  Defendant seeks summary judgment on these claims, asserting that the record includes no evidence that it ever denied Plaintiff an accommodation she requested. The Court agrees with Defendant and grants summary judgment in its favor on Plaintiff's failure to accommodate claims in both counts of the complaint.

### A.  Legal Standard

Where, as here, a plaintiff's status as a disabled individual is not in dispute, the standards for analyzing claims for disability discrimination under the CFEPA and the ADA are the same. *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 255 (D. Conn. 2019); *Payne v. PSC Indus. Outsourcing, Ltd. P'ship*, 139 F. Supp. 3d 536, 543–44 (D. Conn. 2015).  To establish a claim for failure to accommodate under either the ADA or the CFEPA, a plaintiff must show that (1) she is a person with a disability under the meaning of the statute; (2) an employer covered by the statute had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). In general, "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).

It is only where an employee's disability is "obvious" that the employer is required to accommodate the employee without having been alerted to the disability. *Brady*, 531 F.3d at 135.

### B. Discussion

Defendant does not dispute that Plaintiff is a person with a disability, that Defendant is covered by both the ADA and the CFEPA, that it had notice of Plaintiff's disability, or that, with reasonable accommodation, Plaintiff could perform the essential functions of her job. Defendant contends, however, that Plaintiff has failed to present evidence that Defendant refused to make reasonable accommodations for Plaintiff. The Court agrees with Defendant and therefore grants its motion with respect to Plaintiff's failure to accommodate claims in Counts One and Two.

Plaintiff's briefing does not respond to Defendant's arguments regarding her failure to accommodate claims. Then, in her Local Rule 56(a)2 statement, Plaintiff admits to facts that fatally undermine these claims. Plaintiff admits that she requested only two accommodations from Defendant with respect to her disability: first, that Defendant not require her to work more than three and a half hours per day; and second, that Defendant permit her to be absent from work for brief intervals for medical treatment. Pl.'s L. R. 56(a)2 St. ¶¶ 10–13. Plaintiff further admits that, in response to these requests, Defendant did not require her to work more than three and a half hours per day and allowed her to take brief absences from work for medical treatment when she needed them. *Id.* ¶¶ 14–15. Although Plaintiff asserts that she "was pressured . . . to return to full duty" and denied her vacation request, *id.* ¶¶ 14, 16, it is undisputed that Defendant fully accommodated the only actual accommodation requests she made, and she offers no case law supporting the proposition that pressure to work without accommodation constitutes a refusal to accommodate. Thus, Plaintiff has offered no evidence that she was denied any reasonable accommodation she requested or otherwise needed to perform her job. As a result, no genuine

issues of material fact remain with respect to the fourth prong of Plaintiff's failure to accommodate claims and these claims must fail.

The Court therefore grants summary judgment in favor of Defendant to the extent Counts One and Two allege that Defendant failed to accommodate Plaintiff's disability in violation of the ADA and the CFEPA.  Because Plaintiff's CFEPA claim in Count Two alleges *only* that Defendant failed to accommodate her, summary judgment is granted in Defendant's favor on Count Two in its entirety.

## VI.    CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Court will convene a conference with the parties to set a trial date and deadlines for pretrial submissions with respect to Plaintiff's disparate treatment wrongful termination claim in Count One.


**SO ORDERED** at Hartford, Connecticut, this 13th day of January, 2023.


                                                    */s/ Sarala V. Nagala*
                                                    SARALA V. NAGALA
                                                    UNITED STATES DISTRICT JUDGE